HIGGINSON, Circuit Judge,
concurring in part and dissenting in part:
I agree with the majority opinion that the Exclusive Management Services Agreement violated the Texas Medical Practice Act and accordingly agree that Plaintiffs’ tortious interference claim predicated on the Exclusive Management Services Agreement cannot survive summary judgment. However, I respectfully disagree with the majority opinion’s conclusions concerning the Purchase Sale Agreement (“PSA”) and the Equity Interest. Assignment Agreement (“Equity Agreement”). Instead, I would hold that Plaintiffs have put forward sufficient evidence—at least at this stage—to create a genuine issue of material fact concerning whether the PSA and Equity Agreement are separate from the unlawful Exclusive Management Services Agreement and therefore, are enforceable.
As an initial uncontested matter, neither the PSA nor the Equity Agreement, standing alone, violates the Texas Medical Practice Act. The PSA expressly conditions its effect on Chaudhry, or his designee, receiving a Texas medical license. And, the Equity Agreement, as an exhibit to the PSA ⅛ subject to the same condition. Thus, the majority opinion’s illegality holding must depend on the assertion that the PSA and the Equity Agreement “were an integral part of the overall scheme for Xenon to control Xenon Texas and were inextricably intertwined with the Exclusive Management Services Agreement.”
Even granting the argument that all three agreements were “inextricably intertwined,” the legal conclusion that the PSA and the Equity Agreement are therefore necessarily illegal and void does not follow, as Texas courts implicitly have held assessing these same agreements.
Under Texas law, which all parties agree applies here, where an “incidental” clause of a contract is unlawful but the “original consideration of the contract is legal,” the “invalid provisions may be severed and the valid portion of the agreement upheld.” Rogers v. Wolfson, 763 S.W.2d 922, 925 (Tex. App. 1989), writ denied (June 7, 1989). “An illegal or unconscionable provision of a contract may generally be severed so long as it does not constitute the essential purpose of the agreement.” In re Poly-Am., L.P., 262 S.W.3d 337, 360 (Tex. 2008). “The relevant inquiry is whether or not parties would have entered into the agreement absent the unenforceable provisions.” Id. If the parties would have still entered into the agreement absent the unenforceable clauses, the illegal terms may be severed and the agreement may still be enforced. See Whiteside v. Griffis & Griffis, P.C., 902 S.W.2d 739, 744 (Tex. App. 1995), writ denied (Nov. 16, 1995). Courts determine whether an illegal clause is sev-erable from the agreement as a whole by looking to the parties’ intent as evidenced by the terms of the agreement. Montgomery v. Browder, 930 S.W.2d 772, 778-79 (Tex. App. 1996), writ denied (Apr. 18, *275 1997) (“Severability of the contract is determined by the intent of the parties as evidenced by the language of the contract.”).
Although asserting that all three agreements essentially functioned as one, the district court did not consider whether the PSA or the Equity Agreement are severa-ble from the Exclusive Management Services Agreement. There is at least enough evidence to find a genuine issue of material fact that they are.
First, and most importantly, the PSA contains a severability clause. Section 15.13 of the PSA provides, “In case any one or more of the provisions contained in this Agreement is for any reason held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unen-forceability will not affect ahy other provisions of this Agreement....” “[T]he purpose of a severability clause is to allow a contract to stand when a portion has been held to be invalid.” John R. Ray & Sons, Inc. v. Stroman, 923 S.W.2d 80, 87 (Tex. App. 1996), ivrit denied (Feb. 21, 1997). Although a severability clause alone will not save an unlawful contract, see Stro-man, 923 S.W.2d at 87, “[t]he presence of a severability clause sheds light on the agreement’s ‘essential purpose.’” Coronado v. D. N.W. Houston, Inc., No. 13-CV-2179, 2015 WL 5781375, at *10 (S.D. Tex. Sept. 30, 2015), Accordingly, Texas courts have relied on the presence of severability clauses to determine that an unlawful clause was not essential to a contract. See, e.cg., Poly-Am., 262 S.W.3d at 360 (“We agree with Poly-America that the intent of the parties, as expressed by the severability clause, is that unconscionable provisions be excised where possible.”).
Second, the recitals to the PSA indicate that the purpose of the agreement was to transfer all of Khan’s interest in Xenon Texas to Chaudhry. That purpose can function entirely independently from the pre-transfer management rights given to Chaudhry by the Exclusive Management Services Agreement. That is, Chaudhry could have purchased Xenon Texas without managing the company prior to the purchase.
Third, the PSA contains terms that make little sense against the backdrop of an enforceable Exclusive Management Services Agreement. For example, why would the PSA require Khan to give Chau-dhry access to Xenon Texas’s books and records when the Exclusive Management Services Agreement gave Chaudhry control over Xenon Texas’s financial reports? These overlapping terms equally suggest that the PSA was intended to operate independently from, not “inextricably intertwined” with, the Exclusive Management Services Agreement.
Fourth, the fact that the parties chose to structure the Exclusive Management Services Agreement, the PSA, and the Equity Agreement as separate agreements suggests that each was meant to function independently. Put another way, there was nothing to stop the parties from drafting a commercially reasonable agreement that combined all three agreements into one.
Significantly to me, finding that the PSA and the Equity Agreement could be enforceable would square our judgment with the rulings of the Texas courts. As the majority opinion acknowledges, Texas courts previously have found the PSA enforceable. Those rulings are in serious tension with the majority opinion’s holding that the PSA is illegal and void under Texas law. The majority opinion’s explanation for this divergence adopts footnote thirty-one of the district court’s opinion. Id. Footnote thirty-one distinguished the Texas cases by arguing that the those cases only concerned the PSA’s legality *276 after Chaudhry received his Texas medical license. The district court reasoned:
Plaintiffs’ allegations of tortious interference in this case, however, allegedly accrued in late 2011 and the early months of 2012, when Plaintiff Chaudhry had neither a Texas administrative medicine license nor a Texas clinical medical license .... Whatever the post-medical li-censure effect was, if any, that the Texas state courts may have found inured to the benefit of Chaudhry when he received a Texas administrative medicine license, he had no administrative medical license or clinical medical license in Texas in late 2011 and during the first nine months of 2012 when the alleged tortious interference occurred, and the contracts then were void as against public policy.
But, the district court’s conclusion is not supported by the record; Plaintiffs have put forward evidence of tortious interference after Chaudhry received his Texas medical license. At his deposition, Chau-dhry stated that on October 9,,2012, Xenon wrote to Khan to inform him that Chau-dhry had obtained his medical license. Chaudhry contends that Khan did not respond to that letter because of Baig’s influence; specifically, he claims that Khan wanted to settle the dispute following Xenon’s letter but did not do so because of Baig. In support, Chaudhry cites Fahim Hashim’s testimony. Hashim testified that Khan did not want to be involved in the ongoing conflict but Baig convinced him otherwise. Accordingly, I am apprehensive that the majority opinion adopts a footnote proposition contradicted both by the record and also by Texas state courts.
That being said, I recognize that there is record evidence to support the argument that the Exclusive Management Services Agreement’s unlawful terms might not be severable from the PSA and the Equity Agreement. For example, the PSA became effective in July 2011—before Dr. Chau-dhry received his medical license. And, although the contemplated purchase was not to occur until after Chaudhry got his license, the preceding time period was still relevant because the PSA set the purchase price as the sum of (1) Xenon Texas’s startup expenses and (2) five percent of collections from anesthesia procedures performed between the effective date and either (a) the closing date or (b) 180 days later. Thus, the purchase price in the PSA depended on revenue generated during the period of unlawful management. This structure allowed Chaudhry to exploit the benefits of business that he generated during the pendency of the Exclusive Management Services Agreement.
To be clear, I would not find—at least at this stage of the litigation—that the PSA and Equity Agreement are lawful. Instead, I would reverse the district court’s holding with respect to the PSA, Equity Agreement, and conspiracy claims, and thereby allow the district court to consider, on a full trial record, whether the PSA and Equity Agreement are so “inextricably intertwined” that they cannot be severed from the unlawful Exclusive Management Services Agreement.
Because I see a material issue of fact as to the separateness of these agreements, and especially because the district court did not engage in any severability analysis that might harmonize our holding with the rulings of the Texas courts, I respectfully dissent.